## CIRCUIT COURT OF THE CITY OF RICHMOND

Appalachian Information, Inc., and
Va. Citizens for Better Reclamation, Inc.

v.

Edmond M. Boggs and
W. Foster Mullins

June 8, 1977

Case No. A-16

By JUDGE MARVIN F. COLE

This matter is before the court on a Petition for Writ of Mandamus filed by Appalachian Information, Inc., against Edmond M. Boggs, Department of Labor and Industry, Division of Mines and Quarries, Commonwealth of Virginia, and W. Foster Mullins, Chief Mine Inspector, alleging a violation of the Virginia Freedom of Information Act. A hearing on the petition was held in this court on March 15, 1977, at which time oral and documentary evidence was presented and the matter was argued by counsel. Since then memoranda have been filed with the court by the respective parties and the court's decision on the petition follows.

It is appropriate to review Title 45.1 of the Code entitled Mines and Mining. Section 45.1 states that Chapters 1 through 14 of the title shall be known as the "Virginia Mine Safety Law of 1966." The purpose of Chapters 1 through 14 of this title is to provide reasonably laws

to promote the safety and health of those engaged in the mining of coal and the quarrying of other minerals, and for the protection and preservation of property.

Section 45.1-2 contains definitions of words used in the title. The word "commissioner" means the Commissioner of the Department of Labor and Industry or such other public officer, employee, board, commission, or other authority of the Commissioner of the Department of Labor and Industry.

Section 45.1-3 states that the Division of Mines, formerly known as the Department of Mines, is continued and it shall be under and subject to the control of the Department of Labor and Industry, and shall have for its purpose the supervision of the execution and enforcement of all laws enacted for the safety of persons employed within or at mines or quarries within the limits of the Commonwealth; and the protection of mine property and other property used in connection therewith. The Division shall be in charge of an official to be known as the Chief of the Division of Mines. He shall be appointed by the Governor and he shall be under the direction of and shall report to the Commissioner of Labor and Industry. Assistant mine inspectors shall be appointed by the Commissioner of Labor and Industry, and each person so appointed hereinafter shall be designated as Mine Inspector.

Section 45.1-4 sets forth qualifications of Chief and Mine Inspectors and is not applicable to this case.

Section 45.1-5 is titled *Schedule of Mine Inspections; conduct of inspections; certificates of inspection; accidents; clearing mines in dangerous condition*, and deserves careful scrutiny. I will survey each section in paragraphs as it appears in 45.1-5.

(a) This paragraph gives a schedule of mine inspections that shall be maintained. Briefly the section states that all mines shall have one complete inspection at least every ninety days. However, special, partial or complete inspections shall be made when deemed necessary by the Chief, or if requested in writing by various other persons.

This paragraph also provides that during an inspection, the inspector shall inspect the surface plant, every working place in the mine, all active haulageways and travelways, entrances to abandoned workings, and accessible old workings, at least one entry of each intake

and return airway in its entirety, escapeways and other places where men work or travel or where dangerous conditions exist, electric installations and equipment, ventilation facilities, communication installations, roof and rib conditions, and roof support practices, blasting practices, haulage practices and equipment and any other condition, practice or equipment pertaining to the health and safety of the employees. The quality of air passing through the last crosscut between the intake and return in any set of entries shall be not less than 6,000 cubic feet of air per minute, and as much more as is necessary to direct and render harmless and carry away flammable and harmful gases. Provided, however, that the quantity of air reaching the last crosscut in pillar sections may be less than 6,000 cubic feet of air per minute, if 6,000 cubic feet of air per minute is being delivered to the intake of the pillar line. He shall make tests for gas and oxygen deficiency in each place which he is required to inspect in the mine. In mines operating more than one shift in a 24-hour period, the inspector shall devote sufficient time on the second and third shifts to determine conditions and practices related to the health and safety of the employees.

(b) This section provides that the certificate of inspection shall show the date of inspection, the condition in which the mine is found, the extent to which the mining laws are being violated, the progress made in the improvement of the mine as such progress relates to the health and safety of the employees, the number of accidents and injuries occurring in and about the mines since the last previous inspection, and all other facts and information of public interest concerning the condition of the mine as may be useful and proper. Where any violations of the mining laws exist, the report shall show the specific section or sections violated and recommendations made or action taken to eliminate such violations.

(c) This section provides that the mine inspector shall deliver one copy of the certificate of inspection to the owner, superintendent, or mine foreman; he shall deliver one copy to the employees safety committee; and one copy shall be posted at a prominent place on the premises where it can be read conveniently by the employees.

(d) The mine inspector shall report immediately any mine fire, mine explosion, and any accident resulting from loss of life, to his superior.

(e) This section provides that the mine inspector shall proceed immediately to the scene of any accident at any mine under his jurisdiction that results in loss of life or serious personal injury, and to the scene of any mine fire or explosion regardless of whether there is loss of life or personal injury. He shall make such investigation and suggestions and render such assistance that he deems necessary for the future safety of the employees, and make a complete report to the chief as soon as practicable.

(f) This section provides that the mine inspector shall take charge of mine rescue and recovery operations whenever a mine fire, mine explosion, or other serious accident occurs, and shall supervise the reopening of all mines or sections thereof that have been sealed or abandoned on account of fire or any other cause.

(g) This section provides that the Chief or mine inspector shall, and is hereby authorized to, order any mines or sections thereof cleared of all persons where, in his opinion, there is imminent or serious danger to the life, or health of the employees therein, and refuse further entry to all persons, except those necessary to correct or eliminate such dangerous condition.

Several witnesses have been called to testify in this case, namely, Edmond M. Boggs, who is the Commissioner of the Department of Labor and Industry; W. Foster Mullins, who is the Chief Mine Inspector for the Division of Mines and Quarries under the Department of Labor and Industry; Arvel J. Newberry, who is a mine inspector in the Division of Mines and Quarries; and Louis F. Wheatley, who is an Industrial Hygienist for the Division of Mines and Quarries. All of these gentlemen testified as to their duties and the same are set forth in the transcript of the evidence of the case in detail. Suffice it to say that the evidence in the case supports the conclusion that the duties performed by all of these gentlemen were in accord with the requirements of Section 45.1-5 of the Code of Virginia, and particularly as set forth in Paragraph (a), (b), (c), (e), (f) and (g) as set forth above.

Section 40.1-11 of the Code of Virginia provides as follows:

> Neither the Commissioner nor any employee of the Department shall make use of or reveal any information or statistics gathered from any person, company or corporation, for any purposes other than those of this title or of Title 45.1.

Title 40.1 of the Code pertains to the Department of Labor and Industry. Since the Bureau of Mines and Quarries is a component part of the Department of Labor and Industry, this section is applicable to employees of the Bureau of Mines and Quarries. It is clear that Section 40.1-11 of the Code prohibits the Commissioner of the Department of Labor and Industry or any employee thereof from making use or revealing any information or statistics gathered from any person, company or corporation unless it serves a purpose set forth in Title 40.1 or 45.1 of the Code.

A study of Section 40.1-11 of the Code of Virginia raises two questions as to the meaning of this section:

(1) What is the meaning of the phrase "make use or reveal any information or statistics gathered from any person, company or corporation?"

(2) What is the meaning of the phrase "for any purposes other than those of this title or of Title 45.1?"

Counsel for the plaintiff argues that the heart of the controversy in this case is the very narrow issue posed by the interpretation of the words "gathered from any person, company, or corporation." He states that the witnesses testified that their inspections did not require the "gathering" of information within the meaning of the statute since they are not gathering information in this sense from any person, company or corporation.

Counsel for the plaintiff argues that the mine inspection reports are reports prepared by the Bureau of Mines and that they are documents that the inspectors themselves create after viewing the workplace. Therefore, the mine inspection reports do not contain information that has been "gathered from any person, company or corporation."

On the other hand the defendant argues that the mine inspection reports are information that is collected by the mine inspectors from their personal inspections of the premises and also information gathered from persons at the mines and that it is information gathered from any person, company or corporation.

It may be helpful to look at the definition of the word "information" as contained in Webster's Dictionary. Among other definitions, one of them is that information is "knowledge obtained from investigation, study, or instruction." When you view the word information in this light, then the information which the mine inspector puts on his report is certainly information that he has gathered from his investigation and study at the mine and certainly the information contained in his report is information gathered from persons and from the company. The fact that the report is prepared and created by the mine inspector does not preclude the information which he puts on his report from being information gathered from any person, company and corporation. The court so finds that the information contained on all of the mine inspection reports described in this case is information gathered from any person, company or corporation as defined in Section 40.1-11.

Once you have concluded that the information gathered by the mine inspector and placed upon his inspection report is "information gathered from any person, company or corporation," and therefore within the terminology as defined in Section 40.1-11, then the statute states that "neither the Commissioner nor any employee of the Department of Labor and Industry shall make use of or reveal any information or statistics *for any purposes other than those of this title and title 45.1*."

Counsel for the defendant states that the mine inspectors report can be disclosed to only such persons as are specifically named in Section 45.1-5(c), namely a copy to the owner, a copy to the employees safety committee, and a copy shall be posted at a prominent place on the premises where it can be read conveniently by the employees. However, this statute merely states what the *mine inspector* shall do with his report, which is the certificate of inspection. Presumably, he can do this before he leaves the premises of the mine. The statute

does not attempt to say specifically what use the Commissioner of the Department of Labor and Industry shall make of the certificate of inspection. However, Section 40.1-11 does severely restrict the use that he may make of the certificate of inspection. It says as follows:

> Neither the Commissioner nor any employee of the Department shall make use of or reveal any information or statistics. . . *for any purposes other than those of this title or of title 45.1.*

What are the purposes of this title (40.1) and 45.1? Both statutes set out their purposes implicitly.

Section 40.1-3 states that the provisions of the title (Labor and Employment) are intended to provide solely for the safety, health and welfare of employees and the benefits thereof shall not run to any other person.

Section 45.1-1 states that the purpose of the chapters on mines and mining is to provide reasonable laws to promote the safety and health of those engaged in the mining of coal and the quarrying of other materials and for the protection and preservation of property. It would, therefore, appear to me that under 40.1-11 that the Commissioner or any employee of the department could make use of or reveal information from the inspector's report for purposes that would promote the safety and health of those engaged in the mining of coal and the quarrying of other minerals and for the protection and preservation of property. This, however, would not include the news media.

It should be noted that the plaintiff has not attempted to secure the mine inspection reports through any of the provisions of Section 40.1 or Section 45.1 of the Code. Rather the defendant relies strictly upon the provisions of Section 2.1-340 of the Code of Virginia entitled "The Virginia Freedom of Information Act."

It is clear from a reading of Section 2.1-340.1 of the Virginia Freedom of Information Act that the purposes sought to be obtained by the General Assembly in the adoption of the Act were twofold: On the one hand the act is "to insure to the people of the Commonwealth ready access to records in the custody of public officials. . ." and on the other hand, the act is to insure "free entry

to meetings of public bodies where the business of the people is being conducted."

The General Assembly provided further in Section 2.1-340.1 of the Freedom of Information Act that where questions arise as to the applicability of the act to particular situations, that the act is to be liberally construed to promote its application and to be narrowly construed against exception or exemption from applicability of the act.

One of the problems that confronts any court interpreting the Virginia Freedom of Information Act is to determine what records are "official records." However, this problem is removed from this case since it has been stipulated by all parties hereto that the mine inspection reports are official records within the purview of the Virginia Freedom of Information Act. It is further stipulated between the parties that the petitioner has complied with all administrative procedures in regard to this case and that the case can therefore be decided by the court strictly on its merits.

The Virginia Freedom of Information Act expressly and explicitly excludes from its operation records that may be subject to other specific provisions of law which limit or prohibit the disclosure of public records. Section 2.1-342 of the Act provides as follows:

(a) *Except as otherwise specifically provided by law*, all official records shall be open to inspection and copying by any citizens of this state during the regular office hours of the custodian of such records. Access to such records shall not be denied to any such citizen of this state, nor to representatives of newspapers and magazines with circulation in this state, and representatives of radio and television stations broadcasting in or into this state; provided that the custodian of such records shall take all necessary precaution for their preservation and safekeeping. . .

The defendant contends that Section 40.1-11 of the Code relating to mines and mining is an express statutory prohibition against the release of information by the

defendants to any unauthorized person or corporation. Therefore, it can be seen that the Virginia Freedom of Information Act expressly recognizes the fact that there are other statutory prohibitions against the release of information and the act specifically provides for the exclusion of such information from the operation of the act. The court therefore finds that Section 2.1-342 of the Freedom of Information Act does provide a statutory prohibition against the release of information by the defendants to any unauthorized person or corporation when read in relation to Section 40.1-11 of the Code. A fair reading of these two sections together make it implicit that the Freedom of Information Act is not applicable to information or statistics gathered from any person, company or corporation for any purposes other than those of Title 40.1 and Title 45.1 of the Code.

Another point raised by the plaintiff in this case is that the defendants have by their actions waived any protection that Section 40.1 might afford to them. They argue that the mine inspection reports may be protected from disclosure by the statute, but when you consider that they do give a copy of the mine inspection report to the United States Department of Interior, and also give a copy of said report to the administrative office of the Chief of the Bureau of Mines, they have waived any protection that they might have had originally under Section 40.1-11. This argument can be disposed of very quickly since the doctrines of estoppel and waiver are not valid against the Commonwealth of Virginia. As set forth in the brief filed by the defendants, state employees have no right to waive a statute passed by the General Assembly. If an employee has taken action contrary to the statute, there has been a violation of law by that employee, but it is not a waiver or an estoppel that will bind the Commonwealth of Virginia to such action of the employee.

In *Main v. Department of Highways*, 206 Va. 143, 150 (1965), the following is stated:

> [I]t is well settled that the doctrine of estoppel does not apply to the rights of a state when acting in its sovereign or governmental capacity. This is so because the legislature

alone has the authority to dispose of or dispense
with such rights.

Certainly the state is acting within its governmental
capacity to provide for the health and welfare of mine
employees and to police the mines and mining operations
of the state.

Also, in accordance with what has been said above,
the Commissioner of Labor and Industry has authority
to use or reveal information so long as he is carrying
out the purposes of 40.1 and 45.1 of the Code.

A third point raised in the case by the defendant
is that the writ of mandamus is not a proper and appropri-
ate remedy for seeking access to the mine inspection
reports under the Freedom of Information Act. The court
holds that this is a proper procedure. Section 2.1-346
states that any person denied the rights and privileges
conferred by this chapter of the Freedom of Information
Act may proceed to enforce such rights and privileges
by petition for mandamus or injunction, and the section
further states that any such petition alleging such denial
by a board, bureau, commission, authority, district or
agency of the state government or by a standing or other
committee of the General Assembly shall be addressed to
the Circuit Court of the City of Richmond. Therefore,
there can be no question but that a petition for mandamus
is a proper procedure in this instance to secure official
records under the Freedom of Information Act.

For the reasons set forth in this letter, the court
finds that the plaintiff is not entitled to have access
or to make copies of the mine inspection reports in the
possession of the defendants and that the Freedom of
Information Act is specifically exempted from these mine
reports by Section 40.1-11.

The court desires to make an editorial comment in
regard to this case, knowing full well that it probably
should not do so. As set forth in this letter the Bureau
of Mines is specifically directed by Section 40.1-11 not
to reveal the information contained in the mine inspection
reports to any unauthorized person.

A copy of the mine inspection report is delivered
to the owner, superintendent or mine foreman at the mine
where the inspection is made. It would appear to me that

the plaintiff should be able to secure a copy of the mine inspection report from the owner, superintendent, or mine foreman at the mine. The only reason one can think of why the mine owner, superintendent or mine foreman would not deliver a copy of the mine inspection report to *The Plow* is that there would be some detrimental information in the mine inspection report that they would not want disclosed to the public. Therefore, they may refrain from making a copy of the same available to the newspaper.

However, a copy of the mine inspection report is delivered to the employees safety committee. A 1976 amendment to Section 45.1-5 of the Code specifically added this provision and inserted in the Code the fact that one copy of the mine inspector's certificate of inspection was to be delivered to the employees safety committee. One cannot imagine why arrangements could not be made with the employees safety committee to make a copy of the mine inspection report and forward the same to *The Plow* and any other newspaper or news media that might desire such a report. It would appear to me that this would serve a very worthwhile purpose of disclosing to the public any conditions of the mine that might be detrimental to the safety and health of those engaged in the mining of coal and the quarrying of other minerals, and for the protection of any preservation of property. It would appear to me that the employees safety committee would be very interested in securing public support to remedy any such conditions that might exist in a mine or quarry.

Despite the beneficial results that might be secured from publication of such information in the news media, this court does not feel that it can legislate in the field and that it should be left to the sound discretion of the General Assembly to change the law if it be in the public interest to do so.